**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| David B. Randol,<br><br>    Plaintiff,<br><br>vs.<br><br>Jo Anne Barnhart, Commissioner of Social Security,<br><br>    Defendant. | No. CV-05-1725-PHX-NVW<br><br>**ORDER** |

The Court has before it Plaintiff's Motion for Summary Judgment, Doc. # 9, Plaintiff's Statement of Facts, Doc. # 8, Defendant's Cross-Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment, Doc. # 13, Defendant's Statement of Facts, Doc. # 12, and Plaintiff's Response to Defendant's Cross-Motion for Summary Judgment, Doc. # 14.

Plaintiff David B. Randol ("Randol") brought this action against the Commissioner Of Social Security ("Commissioner"), alleging that his application for Disability Insurance Benefits ("DIB"), period of disability, and supplemental security was wrongfully denied. Randol now moves for reversal of the decision below and a remand for a new hearing or an award of benefits. The Commissioner cross-moves for summary judgment.

## I. Statement of the Case

Randol , age forty-four at the time of the hearing before the Administrative Law Judge ("ALJ"), has a high school equivalency education (GED), and his past occupations include work as a delivery driver and as a pavement sweeper. Randol stopped working on December 6, 2001. Tr. at 63.

Randol suffered his first episode of syncope (i.e., fainting) on December 6, 2001, the date on which he alleges his disability began. He alleges that he frequently experiences these episodes. Some of the episodes have resulted in trips to the emergency room because Randol unexpectedly lost consciousness and hurt himself falling to the ground. On August 8, 2002, Randol had a Medtronic Reveal Event Monitor placed in his chest. Following the implantation, Randol continued to have episodes of syncope. Several of these episodes resulted in other medical issues, such as a knee strain. Tr. at 356. On April 27, 2004, Randol had a pacemaker implanted. Randol's condition prevents him from driving an automobile. Tr. at 383.

Dr. Dykstra, D.O., one of Randol's treating physicians, stated in his July 13, 2004 treating notes that Randol's medical condition was severe and that Randol has been unable to work. Tr. at 339. In a letter written to the ALJ on October 17, 2004, Dr. Dykstra opined that Randol's syncope episodes would cause Randol to miss up to four days a month of work. Tr. at 374. Dr. Kazmi, Randol's other treating physician, stated that Randol cannot work because of his fainting episodes, which occur at least two or three times per month, cause Randol to faint, and place Randol and others in danger. Tr. at 383.

On March 12, 2002, Randol filed a claim with the Social Security Administration, asking for a period of disability, for DIB, and for supplemental security income. Randol alleged that he became disabled on December 6, 2001. The SSA initially denied his claim and then denied reconsideration. Randol requested a hearing before an ALJ, which was held on November 8, 2004.

At the hearing, the ALJ heard testimony from Randol, his attorney, a vocational expert, and a medical expert. In his Notice of Decision, the ALJ concluded that Randol's

1  history of syncope and dizzy spells is considered severe pursuant to 20 CFR §§ 404.1520(c) and 416.920(c). Tr. at 24. The ALJ also concluded that Randol could perform sedentary work, rendering Randol unable to perform his past occupation, but not precluding all work. Tr. at 24. The ALJ therefore concluded that Randol was not disabled within the meaning of the SSA. Tr. at 33. On March 3, 2005, the Appeals Council denied Randol's Request for Review, adopting the ALJ's findings as the final decision of the Commissioner. Randol appeals the ALJ's findings in this court.

Randol argues that the ALJ (1) improperly disregarded the medical opinions of Randol's treating physicians, (2) misinterpreted evidence, and (3) failed to characterize Randol's knee condition as severe.

**II.   Standard of Review**

The court reviews only those issues raised by the party challenging the ALJ's decision. *See Lewis v. Apfel*, 236 F.3d 503, 517 n.13 (9th Cir. 2001). In its review, the court "may set aside a denial of disability benefits only if it is not supported by substantial evidence or if it is based on legal error." *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citations omitted); *see Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996). "Substantial evidence is relevant evidence which, considering the record as a whole, a reasonable person might accept as adequate to support a conclusion." *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995) (citations omitted). Such evidence is "more than a scintilla" but "less than a preponderance." *Smolen*, 80 F.3d at 1279 (citations omitted). As a general rule, "[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002) (citations omitted).

**III.  Legal Standard**

Part 404.1520 of the Code Of Federal Regulations describes the five-step sequential evaluation process used in determining whether a claimant is disabled. The five steps are (1) whether the claimant is currently working, (2) whether the impairment is severe, (3) whether the impairment meets or equals an impairment in Appendix 1 of Subpart P of the regulations,

- 3 -

1  (4) whether the claimant can perform work performed in the past, and (5) whether the
2  claimant has the ability to perform other work.  20 C.F.R. § 404.1520(a)(4)(i-v).  The
3  questions are addressed in order; certain responses to these questions will lead to automatic
4  eligibility or ineligibility.  *See id.*  The ALJ in Randol's case made his decision at step five
5  of the analysis.  Tr. at 25.

6  Although the claimant bears the burden of proving disability during the first four steps
7  of the sequential evaluation, "the burden shifts to the Commissioner in step five to show that
8  the claimant can perform other substantial gainful work."  *Burch v. Barnhart*, 400 F.3d 676,
9  679 (9th Cir. 2005) (citations omitted); *see also Smolen v. Chater*, 80 F.3d 1273, 1289 (9th
10 Cir. 1996) ("A claimant establishes a prima facie case of disability by showing that her
11 impairment prevents her from performing her previous occupation." (citations omitted)).
12 Where applicable, the medical-vocational guidelines can provide evidence of other jobs so
13 as to allow the Commissioner to carry that burden.  *Heckler v. Campbell*, 461 U.S. 458, 468
14 (1983).  The ALJ asks hypothetical questions of the vocational expert containing the details
15 of the claimant's impairments; the expert then recounts the number of suitable positions for
16 the claimant in the national economy.  Such suitable positions must be specifically referenced
17 and include "realistic job opportunities."  *Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir.
18 1989).

19 **IV.    Analysis**

20         **A.    The ALJ's Properly Disregarded Dr. Dykstra and Dr. Kazmi's Medical**
21                **Opinions.**

22 Randol asserts that the ALJ did not accord proper weight to the opinions of Dr.
23 Dykstra and Dr. Kaszmi, both of whom were Randol's treating physicians.  "While the ALJ
24 may disregard the opinion of a treating physician, whether or not controverted, the ALJ may
25 reject an *uncontroverted* opinion of a treating physician only for clear and convincing
26 reasons." *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995)(emphasis in original).  The
27 ALJ sought medical expert testimony from an expert, but that testimony did not contradict
28 the medical opinions provided by Randol's treating physicians.  Neither Randol's treating

physicians nor Dr. Minkoff identified the medical cause of Randol's syncope episodes. Therefore, Dr. Dykstra and Dr. Kaszmi's medical opinions were uncontroverted, and the ALJ was required to provide clear and convincing reasons for his decision to reject them. An ALJ must set forth such a conclusion in proper detail. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).

### 1. Dr. Dykstra

On October 17, 2004, Dr. Dykstra stated that Randol would be absent up to four days each month because of his syncope episodes. Tr. 374. The ALJ first cited Dr. Dykstra's treating notes as evidence undermining this opinion. In particular, the ALJ cited Dr. Dykstra's March 19, 2002 treating notes, which indicated that Randol's monitor did not capture any syncope episodes between the February 2, 2002 and the March 19, 2002 visits, a period of more than a month. Tr. 241. The ALJ was correct–this notation undermines Dr. Dykstra's opinion.

In addition, the ALJ cited other doctors' treating notes to demonstrate that Randol made inconsistent claims concerning the frequency of his syncope episodes. Randol told Dr. Jongsman that he had one episode per month, Tr. at 182; told Dr. Bragdon that he had three episodes per month, Tr. at 188; told Dr. Snow that he had experienced approximately 20 syncope episodes over the past two to three years, Tr. at 305; and told Dr. Swarup that he had one episode per month, Tr. at 391. The ALJ properly cited these treating notes of these other doctors as evidence undermining Dr. Dykstra's conclusion.

The ALJ set forth clear and convincing reasons supporting his decision to disregard Dr. Dykstra's medical opinion. Both Dr. Dykstra's own treating notes and the treating notes of Randol's other doctors suggested that Randol did not experience four episodes per month. Therefore, the ALJ properly disregarded Dr. Dykstra's October 17, 2004 medical opinion.

### 2. Dr. Kazmi

On November 4, 2004, Dr. Kazmi authored a letter in which he stated that Randol was "unable to be in the work field" because Randol's fainting episodes could hurt Randol or others. Tr. at 383. The ALJ disregarded Dr. Kazmi's opinion because (1) it was not

1  supported by Dr. Kazmi's treatment records, (2) it was not supported by other doctors'
2  treating notes, and (3) Dr. Kazmi had not seen Randol since August 21, 2003.

3        The ALJ first cited Dr. Kazmi's treatment records to undermine Dr. Kazmi's medical
4  opinion. Specifically, the ALJ pointed to the fact that Dr. Kazmi's treatment record indicated
5  that Randol had a normal EEG. This was error. The fact that Randol had a normal EEG does
6  not undermine Dr. Kazmi's conclusion that Randol could not work. The question is whether
7  Randol's syncope episodes were frequent and severe enough to qualify as a disability under
8  the SSA. The ALJ provided no explanation why Randol's EEG reading would have any
9  bearing on this issue.

10        The ALJ also cited an inconsistency between Dr. Kazmi's November 4, 2004 medical
11  opinion and the medical opinion of Dr. Mattoni, the doctor who installed Randol's
12  pacemaker. Dr. Kazmi stated that "[i]t is very difficult for him [referring to Randol] to
13  predict when this passing out is going to happen." Tr. at 383. By contrast, Dr. Mattoni
14  stated that Randol "is very happy with his current control of his syncope. He states that he
15  had one episode that he had a warning for and this is new for him. He previously never had
16  any warning, which had scared him in regards to injury." Tr. at 391. Dr. Mattoni's statement
17  undermines Dr. Kazmi's opinion that the pacemaker had not helped Randol control his
18  syncope episodes and the resulting injuries that Randol suffered from fainting without
19  warning.

20        The ALJ also pointed to the fact that Dr. Kazmi had not seen Randol since August 21,
21  2003, over a year before Dr. Kazmi authored his November 4, 2004 medical opinion. Randol
22  first saw Dr. Kazmi on July 28, 2003, over a year after Randol first filed for social security.
23  Tr. at 377. Randol saw Dr. Kazmi again on August 14, 2003. Tr. at 380. In total, Dr. Kazmi
24  examined Randol two times, approximately fifteen months before Dr. Kazmi wrote his
25  medical opinion. "[T]he relationship [referring to the doctor-patient relationship] is better
26  viewed as a series of points on a continuum reflecting the duration of the treatment
27  relationship and the frequency and nature of the contact." *Benton v. Barnhart*, 331 F.3d
28  1030, 1038 (9th Cir. 2003)(discussing the level of deference the ALJ must provide to a

1  treating physician). Therefore, the fact that Dr. Kazmi had not seen Randol in over a year
2  supports the ALJ's decision to reject Dr. Kazmi's opinion.

3  The facts (1) that Dr. Kazmi's medical opinion was inconsistent with Dr. Mattoni's
4  report and (2) that Dr. Kazmi had not seen Randol for approximately fifteen months
5  undermine Dr. Kazmi's conclusion that Randol could not work because he was a risk to
6  himself and others. Furthermore, as *Benton* explains, the deference provided to a treating
7  physician depends on the frequency and duration of the doctor-patient relationship.
8  Therefore, the ALJ properly disregarded Dr. Kazmi's November 4, 2004 medical opinion.

9  **B.     The ALJ Did Not Misinterpret Evidence to the Detriment of Randol**

10  The ALJ questioned a medical expert, Dr. Sherman M. Minikoff, at the hearing. In
11  his decision, the ALJ adopted Dr. Minikoff's opinion that there was no medical evidence
12  establishing that Randol had either a cardiac or seizure condition. Tr. at 19-20. At the
13  hearing, Dr. Minikoff testified that it was possible that Randol experienced three to four
14  syncope episodes per month. Randol argues that the ALJ erred by not including this portion
15  of Dr. Minikoff's testimony in his decision.

16  "It is not necessary to agree with everything an expert witness says in order to hold
17  that his testimony contains substantial evidence." *Magallanes v. Bowen*, 881 F.2d 747, 753
18  (9th Cir. 1989)(citations omitted). As discussed above, the ALJ provided clear and
19  convincing reasons supporting his decision to reject Dr. Kazmi and Dr. Dykstra's opinions
20  that Randol experienced syncope episodes three to four times per month. Therefore, the ALJ
21  did not err by deciding not to adopt that portion of Dr. Minikoff's testimony.

22  Randol also argues that the ALJ failed to take into account the vocational expert's
23  statement that it would be impossible for an individual whose medical condition required two
24  to three absences per month to find work. "The testimony of a vocational expert is valuable
25  only to the extent that it is supported by medical evidence." *Id.* at 756 (citations omitted).
26  The ALJ did not adopt the vocational expert's conclusion because the ALJ did not believe
27  that Randol experienced syncope episodes three to four times per month. As discussed
28

above, the ALJ properly disregarded Dr. Dykstra's and Dr. Kazmi's medical opinions. The ALJ therefore did not err in declining to adopt the vocational expert's conclusion.

### C. The ALJ Properly Concluded that Randol's Knee Condition Was Not Severe

The ALJ concluded that Randol's knee condition was not severe over a continuous twelve-month period, as required under the SSA. Randol argues that this conclusion was in error because he underwent three surgical procedures on his knee over a twenty-month period.

Randol underwent knee operations on (1) August 2, 2001, (2) February 1, 2002, and (3) May 16, 2003. To support his conclusion that Randol's knee condition was not severe, the ALJ cited Dr. Hop's February 1, 2002 post-operative diagnosis that Randal had a "[n]ormal knee on arthroscopic evaluation." Tr. at 20. The ALJ also cited x-rays taken on November 11, 2003, following the May 16, 2003 operation, that showed no evidence of a fracture. Tr. at 21.

Randol had the burden of establishing the severity of his knee condition. He failed to demonstrate that his knee was impaired for twelve consecutive months. The fact that Randol needed to have three operations on his knee does not necessarily establish that Randol satisfied the twelve month durational requirement. In particular, the February 1, 2002 surgery revealed that Randol had a normal knee, undermining Randol's argument that his knee condition was severe from August 2001 to the present. While the record demonstrates that Randol's knee required medical attention on several occasions, the ALJ adduced substantial evidence that his knee condition was not "severe" for the requisite twelve-month period.

### V. Substantial Evidence

The only inquiry left before the court is whether the ALJ's decision "is supported by substantial evidence." *See Jamerson*, 112 F.3d at 1066. Randol's argument for why the ALJ did not have substantial evidence rested on his assertions that the ALJ (1) improperly disregarded Dr. Dykstra and Dr. Kazmi's medical opinions, (2) misinterpreted evidence, and

- 8 -

(3) failed properly to consider the severity of Randol's knee problem. Randol's assertions are incorrect. Dr. Dykstra's and Dr. Kazmi's medical opinions were properly disregarded for clear and convincing reasons. The ALJ did not misinterpret evidence to the detriment of Randol. Furthermore, Randol did not meet his burden of establishing that his knee impairment was severe over a continuous twelve-month period.

Randol has not provided any additional legal arguments for his position that the ALJ's decision was not supported by substantial evidence. Therefore, the ALJ's decision is affirmed.

IT IS THEREFORE ORDERED that Plaintiff Randol's Motion for Summary Judgment, Doc. # 9, is denied.

IT IS FURTHER ORDERED that Defendant's Cross-Motion for Summary Judgment, Doc. # 13, is granted. The clerk is directed to enter judgment in favor of Defendant and that Plaintiff take nothing. The clerk is directed to terminate this case.

DATED this 20th day of December, 2005.

_____
Neil V. Wake
United States District Judge